# In the United States Court of Federal Claims

No. 19-1407
(Filed: June 29, 2023)

```
*************************************
KANDI ARNHOLD, et al.,              *
                                    *
                Plaintiffs,         *
                                    *
       v.                           *    Class Certification; RCFC 23; Fifth
                                    *    Amendment Takings Clause;
                                    *    Avigation Easement.
THE UNITED STATES,                  *
                                    *
                Defendant.          *
*************************************
```

*Roger J. Marzulla*, with whom were *Nancie G. Marzulla*, and *Cindy Lopez*, Marzulla Law, LLC, Washington, DC, counsel for Plaintiffs. Also with whom were *Stephen E. Morrissey, Jordan Connors, Jenna G. Farleigh, and Emily Parsons*, Susman Godfrey LLP, Seattle, Washington.

*Brigman L. Harman*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

Plaintiffs Kandi Arnhold, *et al.*, bring a putative class action against the United States alleging claims for violation of the Takings Clause of the Fifth Amendment and breach of contract. Before the Court is plaintiffs' motion for class certification under Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC"). The motion is fully briefed, and oral argument was held on April 18, 2023. Because the Court finds that plaintiffs have failed to satisfy the commonality, typicality, and superiority requirements of RCFC 23, their motion for class certification is **DENIED**.

## I.   BACKGROUND

Plaintiffs are the owners of more than 50 properties located near Outlying Field Coupeville ("OLF Coupeville"), a small landing strip on Whidbey Island, Washington.[1] First Am. Compl. [ECF 49] ¶¶ 1, 4. Whidbey Island is 55 miles long and has more than 80,000 residents. *Id.* ¶ 61. It "is [] home to Naval Air Station Whidbey Island ("NASWI")." *Id.* ¶ 62. OLF Coupeville, which includes a control tower as well as a landing strip, is located "among

---

[1] "Whidbey Island is located in the Pugent Sound, approximately 30 miles north of Seattle[,] [Washington]." First Am. Compl. [ECF 49] ¶ 61.

farms and residential communities near Coupeville," separate from the other NASWI facilities. *Id.* ¶ 64.

OLF Coupeville was built in 1943 and has been used to train Navy pilots for various combat operations. [ECF 49] ¶¶ 64, 65. In 1968, "the Navy began using OLF Coupeville for 'field carrier landing practice'" in support of the Vietnam War effort. *Id.* ¶ 65. Field carrier landing practice, also known as "touch and go" landings, simulates the act of landing on an aircraft carrier at sea. *Id.* The practice involves "groups of several aircraft flying in patterns, with each plane then approaching the runway, touching down, and then taking off again without coming to a stop." *Id.* "Each aircraft makes multiple touch-and-go landings during each exercise and circles multiple times over the area neighborhoods." *Id.*

In the mid-1980's, the Navy began increasing the number of touch-and-go flights by the EA-6B Prowler aircraft out of OLF Coupeville. [ECF 49] ¶ 66. As a result of this increase in flights, owners of land located in the vicinity of OLF Coupeville sued the United States in 1992, alleging that the increase in Prowler flights resulted in an unconstitutional taking of their property. *Id.* Pursuant to the terms of the 1997 settlement of that case, the Navy agreed to limit flights over an area called Admiral's Cove and to pay 16 landowners a lump sum. [ECF 49-1] at 3.[2] The Navy further agreed to only fly certain aircraft, including the Prowler "or follow-on aircraft of lesser or comparable noise level," and to fly "no more than 10,000" flights over the plaintiffs' property per calendar year via OLF Coupeville. *Id.* at 3-4. As to a subset of plaintiffs in that case, including those who lived in an area called Reeder Bay, the Navy purchased the right to fly military jets over 1,000 feet. *Id.* In the 1990's, the Navy promised the Coupeville community that it would not conduct training flights after 10:30 p.m., fly touch-and-go missions more than two days in a row, or fly on weekends. [ECF 49] ¶ 67.

In November 2016, the Navy released a draft Environmental Impact Statement ("EIS"), which detailed its plan to make NASWI the national hub for Boeing EA-18G Growler ("Growler") airplanes. [ECF 49] ¶ 68; *see also* Draft Env't Impact Statement [ECF 55-12].[3] On June 25, 2018, the Navy announced its plan to relocate 36 Growlers to Whidbey Island, along with 628 Navy personnel. [ECF 49] ¶ 69. It also announced its plan to increase the number of annual airfield operations. *Id.* On September 28, 2018, the Navy published its final EIS regarding increased Growler operations on Whidbey Island. [ECF 49] ¶ 70; *see also* Final Env't Impact Statement [ECF 55-28].[4] In the final EIS, the Navy predicted that Growler operations would increase by approximately 33% and that this would in turn, "require the development of Accident Potential Zones ('APZs')."[5] [ECF 49] ¶ 73 (quoting final EIS). In addition, the Navy

---

[2] All page numbers in the parties' briefings refer to the page numbers generated by the CM/ECF system.

[3] Due to the size of the draft EIS, plaintiffs provided a link to a web-based copy of the document at https://media.defense.gov/2019/Feb/05/2002086230/-1/-1/1/WHIDBEY%20ISLAND%20EIS%20VOLUME%20I%20FULL%20DOCUMENT.PDF.

[4] Due to the size of the final EIS, plaintiffs provided a link to a web-based copy of the document at https://www.nepa navy mil/growler/EIS-Docs/.

[5] APZs are zones that "follow departure, arrival, and flight pattern tracks and are based on analysis of historic data." U.S. Navy, Accident Potential Zones (APZS) and their Potential Impact on Central Whitbey [ECF 55-27] at 2.

established three flight zones "deemed incompatible with most residential use." *Id.* ¶ 76 (quoting final EIS). Most of the Admiral's Cove community and the entirety of the Reeder Bay community fell "within the area designated as requiring primary APZ status." *Id.* ¶ 78 (quoting final EIS).

Growlers are specialized jets that focus on electronic warfare.[6] [ECF 49] ¶ 81. The jets are 60.2 feet long, 16 feet high, have a wingspan of 44.9 feet, and an estimated top speed of 1,181 miles per hour. *Id.* According to plaintiffs, all of their homes are within a geographic area which, during high tempo field-carrier landing practices, experiences day-night average sound levels ("DNL") greater than 65 decibels ("dB"). *Id.* ¶ 86. On March 12, 2019, the then-acting Secretary of the Navy, Richard Spencer, issued a Record of Decision ("ROD") memorializing the Navy's intent to expand Growler operations on Whidbey Island. [ECF 55-11]. Immediately thereafter, flight operations increased at OLF Coupeville. Pls.' Mot. for Class Cert. of their Fifth Amend. Takings Claims [ECF 55] at 13; *see also* Capt. Arny Test. [ECF 55-13] at 5.

Plaintiffs define themselves as "all property owners whose use and enjoyment of their real property was destroyed or substantially interfered with on and after March 12, 2019, by the increased operations of the Navy's EA-18G Growler fighter jets from NAS Whidbey Island and OLF Coupeville over and around Plaintiffs' property." [ECF 49] ¶ 92. Plaintiffs propose three subclasses. *Id.* Subclass 1, "Owners of Properties in the APZ Zones," includes the "[o]wners of all residential properties as of March 12, 2019, located in one of the [APZs] included in the Navy's Final [EIS] Statement dated March 12, 2019." *Id.* Subclass 2, "65+ dB DNL," includes the "[o]wners of all residential properties as of March 12, 2019, located in a noise zone of 65+ dB DNL or Day-Night Average Sound Level during high tempo field-carrier landing practices."[7] *Id.* Subclass 3, "Reeder Bay Plaintiffs,"[8] includes the "[o]wners of land in Reeder Bay as of March 12, 2019 [, . . . who] are all within one of the [APZs] included in the Navy's Final [EIS] dated March 12, 2019." *Id.* Plaintiffs also propose two damages subclasses. [ECF 55] at 17. The first damages subclass "includes the owners of residential properties as of March 12, 2019, located in the [APZ] proposed by the [Navy's 2021] Air Installation and Compatible Use Zone study." *Id.* at 18. The second damages subclass "includes the remainder of the individuals within the 65 dB sound zone who owned residential property as of March 12, 2019 (the remainder of the proposed class) but those outside of the proposed APZ." *Id.* at 21. According to plaintiffs' damages expert, the damages applicable to properties in both subclasses can be mass calculated. *Id.*

---

[6] The planes' electronic warfare capabilities include performing escort jamming and standoff jamming missions. [ECF 49] ¶ 81. When flown together, the jets "can generate targeting tracks for hostile radio-frequency sources in real time." *Id.*

[7] According to plaintiffs, they defined this class using the 65 dB DNL cut-off because the Federal Aviation Administration and the Department of Defense use it "as a threshold for land use recommendations" in various programs. [ECF 55] at 17.

[8] The Reeder Bay plaintiffs also assert a separate breach of contract claim. *See* [ECF 49] ¶¶ 106-15; *see also* [ECF 55] at 21 n.5. Plaintiffs do not seek class certification as to this subset of plaintiffs with respect to their breach of contract claim. [ECF 55] at 21 n.5.

## II.   LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (quotation marks omitted). "[T]he efficiency and economy of litigation . . . is a principal purpose of [class action] procedure." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974); *see also Bright v. United States*, 603 F.3d 1273, 1288 (Fed. Cir. 2010) (applying standard). RCFC 23 governs class action suits brought in the United States Court of Federal Claims. It provides as follows:

> (a)   **Prerequisites.** One or more members of a class may sue as representative parties on behalf of all members only if:
>   (1)   the class is so numerous that joinder of all members is impracticable;
>   (2)   there are questions of law or fact common to the class;
>   (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>   (4)   the representative parties will fairly and adequately protect the interests of the class.
>
> (b)   **Class Actions Maintainable.** A class action may be maintained if RCFC 23(a) is satisfied and if:
>   (1)   [not used];
>   (2)   the United States has acted or refused to act on grounds generally applicable to the class; and
>   (3)   the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>     (A)   the class members' interests in individually controlling the prosecution of separate actions;
>     (B)   the extent and nature of any litigation concerning the controversy already begun by class members;
>     (C)   [not used]; and
>     (D)   the likely difficulties in managing a class action.

RCFC 23(a)-(b). The requirements of sections (a) and (b) are in the conjunctive; thus, a failure to satisfy either one of them is fatal to class certification. *Horvath v. United States,* 149 Fed. Cl. 735, 745 (2020).[9] The party seeking certification bears the burden of establishing that the requirements of RCFC 23 have been met by a preponderance of the evidence. *See Dukes*, 564

---

[9] Courts vary in their approach to class certification under RCFC 23. Some courts analyze the requirements of sections (a) and (b) concurrently, considering predominance as part of RCFC 23(a)'s commonality requirement. *See, e.g., Oztimurlenk v. United States,* 162 Fed. Cl. 658, 669 (2022) (defining the requirements of RCFC 23). Other courts analyze the requirements of sections (a) and (b) separately. *See, e.g., Fisher v. United States*, 69 Fed. Cl. 193, 198-206 (2006) (applying RCFC 23(b)). The Court has wide discretion in deciding whether the requirements have been satisfied, so long as it conducts a rigorous analysis under the rule. *See Horvath,* 149 Fed. Cl. at 743. Here, the Court analyzes commonality and predominance concurrently.

U.S. at 350; *see also Bell v. United States,* 123 Fed. Cl. 390, 395 (2015). "Class certification is at the discretion of the trial court." *Bell*, 123 Fed. Cl. at 395 (collecting cases); *see also Fink v. Nat'l Sav. & Tr. Co.,* 772 F.2d 951, 960 (D.C. Cir. 1985).[10]

## III.   DISCUSSION

Sections (a) and (b) of RCFC 23 are often viewed as consisting of five requirements: (a) numerosity, (b) commonality, (c) typicality, (d) adequacy, and (e) superiority.[11] *Barnes v. United States*, 68 Fed. Cl. 492, 494 (2005); *accord Horvath*, 149 Fed. Cl. at 743. Plaintiffs aver that they have satisfied each of the requirements necessary for class certification. The government counters that plaintiffs fail to satisfy four of the five requirements. For the reasons explained below, the Court finds that plaintiffs have satisfied the numerosity and adequacy requirements, but have failed to satisfy the remaining three requirements.

### A.   Numerosity

"Ordinarily for class actions, the requirement of 'numerosity' is satisfied if 'the class is so numerous that joinder of all members is impracticable.'" *Haggart v. United States*, 89 Fed. Cl. 523, 530 (2009) (quoting RCFC 23(a)(1)). "Yet, for an opt-in class action, each participating member of the class must act affirmatively to participate, which amounts to joinder in pragmatic terms." *Id.* "Practicability of joinder depends on the size of the class, the ease of identifying its members and determining their addresses, the facility of making service on them if joined and their geographic dispersion." *Bell*, 123 Fed. Cl. at 395 (quoting *Jaynes v. United States*, 2005 WL 6112634, at *4 (Fed. Cl. Aug. 19, 2005)). "A putative class with a large number of plaintiffs is more likely to have a strong impracticability argument under some factors than a putative class with a small number of plaintiffs." *Oztimurlenk v. United States*, 162 Fed. Cl. 658, 674 (2022). However, "[t]he precise size of the putative class, standing alone, is not dispositive[.]" *Id.* "In determining whether numerosity has been satisfied, the court also considers the size of each individual putative plaintiff's claim and whether it 'hinders the ability of a plaintiff to file any action at all.'" *Haggart*, 89 Fed. Cl. at 532 (quoting *King v. United States*, 84 Fed. Cl. 120, 125 (2008)). The smaller the value of the claim, the less likely it is that any individual plaintiff will pursue his case without the attendant benefits of a class action, such as class representation. *Haggart*, 89 Fed. Cl. at 532; *accord Geneva Rock Prod., Inc. v. United States*, 100 Fed. Cl. 778, 787 (2011) (noting that joinder can be impracticable where the cost of litigation outweighs the value of the claim).

---

[10] RCFC 23 "is modeled largely on the comparable [Federal Rule of Civil Procedure ("FRCP") 23]." Rule Committee Notes on RCFC 23, 2002 Rev. Although there are some notable differences between RCFC 23 and FRCP 23—among these, RCFC 23's contemplation of only opt-in classes and the Court of Federal Claim's inability to accommodate declaratory and injunctive relief—the Court will consider other federal courts' application of FRCP 23 persuasive when that reasoning is unaffected by these differences. *See Horvath,* 149 Fed. Cl. at 743 n.4.

[11] Plaintiffs contend that in addition to the requirements provided in RCFC 23(a), the Court must also determine whether the class is ascertainable. [ECF 55] at 31. However, the authority plaintiffs cite in support of this proposition—authority from the Northern District of California, the 11th Circuit, and the Central District of California—is not binding on this Court. Therefore, the Court need not consider this requirement.

Here, "[p]laintiffs estimate that there are approximately 3,000 people residing in the proposed class area." [ECF 55] at 25 (citing [ECF 49] ¶ 93); *see also* Pls.' Reply in Support of Mot. for Class Certification [ECF 62] at 9 (stating that "[t]here are upwards of 2,600 potential class members[.]"). According to plaintiffs, the sheer size of their putative class satisfies the numerosity requirement. [ECF 55] at 25. In addition, plaintiffs contend that "[a]lthough the potential class members lived in a geographically concentrated area surrounding OLF Coupeville in March of 2019," since then, "a sizeable number of them" have sold their properties and moved elsewhere due to the increase in Growler flights. [ECF 62] at 10. Specifically, plaintiffs aver that the five proposed class representatives have purchased new properties outside of the affected region. *Id.* The government counters that, while the number of potential class members is a central inquiry when analyzing the numerosity requirement, plaintiffs have failed to demonstrate that the putative class is so large that proceeding through joinder is impracticable. Def.'s Opp'n to Pl.'s Mot. for Class Cert. [ECF 58] at 22. In support of its view, the government states that the fact that the litigation has proceeded to-date through joinder and that the putative class members are located in a confined geographic area and are easily identifiable tips the scales in favor of joinder. *Id.* at 21-22.

The Court finds that plaintiffs have satisfied the numerosity requirement. It is true that this case thus far has proceeded through joinder and that the putative class members are geographically proximate. It is also evident that the size of each individual plaintiff's claims is such that an individual plaintiff may very well be willing to pursue a case without the benefit of a class action.[12] *See King*, 84 Fed. Cl. at 125 ("Another factor in determining numerosity is whether the size of each individual plaintiff's claim hinders the ability of a plaintiff to file any action at all. The smaller the size of the claim and the larger the number of persons, the less likely it is that, without the benefit of a class action, any plaintiff will recover.") (citation omitted). Nevertheless, while not dispositive, the number of potential class members is generally considered to be the most important factor of the numerosity requirement. *Common Ground Healthcare Coop. v. United States*, 137 Fed. Cl. 630, 638 (2018) (citing *King*, 84 Fed. Cl. at 124). Plaintiffs represent that there are "upwards of 2,600 potential class members" based on an estimated number of residents residing in the proposed class area. [ECF 55] at 25; [ECF 62] at 9. This estimated class size far exceeds the class sizes that the Court of Federal Claims has found to be sufficient to satisfy the numerousity requirement. *Brown v. United States*, 126 Fed. Cl. 571, 578 n.3 (2016) (acknowledging that the Court of Federal Claims has found potential class sizes of 23, 25, 135, 150, and 152 members sufficient to satisfy the numerosity requirement). Further, the fact that plaintiffs have been able to identify and join 75 additional putative class members suggests, as the government notes, *see* [ECF 58] at 21, that joinder is not impracticable despite plaintiffs' estimated class size. However, although the ease of identifying class members and their geographic proximity weigh in favor of joinder, *see Bell*, 123 Fed. Cl. at 400, "the count of potential class members speaks to the practicability of joining *all* of them," *Oztimurlenk*, 162 Fed. Cl. at 676 (emphasis added). In this case, the large number of potential class members is sufficient to overcome these other factors and satisfy the numerosity requirement.

---

[12] While it is unclear how the size of plaintiffs' claims relates to the likely attorney's fees and costs of bringing a case, plaintiffs contend that class members within the first damages subgroup suffered a 100% diminution in the value of their properties and those within the second damages subgroup suffered a 27% diminution in the value of their homes. [ECF 55] at 21.

### B. Commonality and Predominance

Commonality requires the plaintiff to demonstrate that "there are questions of law or fact common to the class[.]" RCFC 23(a)(2). It is not sufficient to merely claim that the class members "have suffered a violation of the same provision of law" because such a claim "gives no cause to believe that all their claims can productively be litigated at once." *Dukes*, 564 U.S. at 350 (2011). Instead, the plaintiff must show "that the class members 'have suffered the same injury' such that the resulting claims 'depend upon a common contention . . . of such a nature that it is capable of classwide resolution.'" *Oztimurlenk*, 162 Fed. Cl. at 676 (quoting *Dukes*, 564 U.S. at 350). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (quotation marks omitted). "[W]here factual issues are not common among numerous potential plaintiffs, the class action is of no greater value than repetitive lawsuits, since under either form of proceeding separate determinations of each factual issue would remain necessary." *Saunooke v. United States*, 8 Cl. Ct. 327, 332 (1985).

Beyond finding a common contention that is capable of classwide resolution, the court must also find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." RCFC 23(b)(3). This requires that the court "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id*. (quotation marks omitted). RCFC 23(b)'s predominance requirement "is far more demanding" than RCFC 23(a)'s commonality criterion. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Unlike RCFC 23(a)(2)'s lesser requirement of a common answer to a common question, "RCFC 23(b)(3) requires the [c]ourt to look across the full set of material questions the proposed class action raises to determine whether the common issues predominate." *Oztimurlenk*, 162 Fed. Cl. at 677. If the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims" after adjudication of the classwide issues, class certification is not appropriate. *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019).

The Fifth Amendment to the United States Constitution provides, *inter alia*, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. As the government aptly notes, *see* [ECF 58] at 7, the Court of Federal Claims has not, to date, certified a class of plaintiffs who allege a taking in the form of an avigation easement by inverse condemnation. Further, avigation easement or flight easement cases appear to be infrequently

filed in federal court.[13] The concept was first defined in *United States v. Causby*,[14] wherein the Supreme Court stated the following:

> The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.

328 U.S. 256, 266 (1946). In reaching this conclusion, the Court noted that "[t]he navigable airspace which Congress has placed in the public domain is airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority," *id.* at 263, which, at the time, was "500 feet during the day and 1000 feet at night for air carriers . . . and from 300 to 1000 feet for other aircraft depending on the type of plane and the character of the terrain," *id.* at 264. The Court further noted the following: "We think that the landowner, as an incident to his ownership, has a claim to [superadjacent airspace at this low altitude] and that invasions of it are in the same category as invasions of the surface." *Id.* at 265.

In *Brown v. United States*, the Federal Circuit clarified that:

> In the *Causby* case, the Court considered three factors significant in determining whether noise and other effects from overflights interfered with the property owner's rights in such a way as to constitute a [physical] taking of an avigation easement and hence require compensation: (i) the planes flew directly over the claimant's land; (ii) the flights were low and frequent, and (iii) the flights directly and immediately interfered with the claimant's enjoyment and use of the land.

73 F.3d 1100, 1102 (Fed. Cir. 1996). In addition, the *Brown* court noted that following *Causby*, "the interference with enjoyment and use [had to] be 'substantial.'" *Id.* Since *Causby*, the concept of an avigation or flight easement has been enlarged to include situations where the flights at issue were above 500 feet if the use of the airspace was "peculiarly burdensome," *Branning v. United States*, 654 F.2d 88, 90 (Ct. Cl. 1981), as well as situations where "plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that significantly impairs their use and enjoyment of their land," *Argent v. United States*, 124 F.3d 1277, 1284 (Fed. Cir. 1997).

---

[13] As of the date of this opinion, only 139 "avigation easement" cases appeared in an online search of "All Federal" cases on West Law. Similarly, only 140 cases appeared when a search was done for cases that contained the words "flight" and "easement" within a sentence. Seven cases appeared when a search was done for cases that contained the phrase "overflight takings."

[14] *See Lacey v. United States*, 595 F.2d 614, 615 (Ct. Cl. 1979) (noting that the Supreme Court first described flight easements in *Causby*).

Here, plaintiffs argue that there are three core common issues of law and fact that must be resolved on a class-wide basis. [ECF 55] at 26. Plaintiffs also contend that class-wide damages can be demonstrated in the aggregate. *Id.* at 34-36. In the government's view, plaintiffs' class definition fails to address the property-specific issues that will necessarily determine both liability and damages. [ECF 58] at 23-40. Specifically, the government argues that plaintiffs fail to satisfy the commonality requirement because their "proposed class definition fails to promote resolution of any issues germane to [the three *Causby*] factors," namely whether "(i) the planes flew directly over the claimant's land; (ii) the flights were low and frequent, and (iii) the flights directly and immediately interfered with the claimant's enjoyment and use of the land." [ECF 58] at 24-25 (quoting *Brown*, 73 F.3d at 1102). In support of its position, the government cites *Testwuide v. United States*, a case in which plaintiffs moved for class certification based on the noise generated by overflying jets and plaintiffs' home ownership within two noise contours. *Id.* at 26-28 (citing 56 Fed. Cl. 755 (2003)). According to the government, because the *Testwuide* court denied class certification due to the plaintiffs' failure to address the fact that certain class members experienced flights that did not pass directly overhead as well as flights that occurred outside of navigable airspace, this Court should similarly deny certification. *Id.* at 27. In addition, the government contends that the proposed class in *Testwuide* was superior to plaintiffs' proposed class because, in *Testwuide*, the class members experienced a change in noise levels before and after the alleged taking based on the location of their properties. *Id.*

The Court agrees that plaintiffs have not satisfied the commonality requirement but disagrees with the government's suggestion that plaintiffs' proposed class definition must directly addresses the *Causby* factors. Referring to the *Causby* factors, the *Testwuide* court denied class certification on the grounds that doing so would be inappropriate "because the inquiry of whether the class could be certified based on noise and home ownership alone is inextricably fused with the legal question of what plaintiffs must establish in order to prove a taking within the meaning of the Fifth Amendment." *Testwuide*, 56 Fed. Cl. at 765. In *Argent*, however, the Federal Circuit stated the following: "Although federal courts have, by and large, required the facts of a case to match the *Causby* paradigm before allowing recovery, nothing in *Causby* or the intervening precedent limits a takings claim to only those facts. Indeed, overflight takings disputes defy *per se* rules or classification." *Id.* at 1282. Thus, this Court need not deny class certification simply because plaintiffs propose a class definition that does not address the *Causby* factors.[15] That said, while the Court finds that plaintiffs identify relevant common questions, the Court also finds that these questions are not equally capable of class-wide resolution.

Plaintiffs proffer the following common questions: (1) whether, after publishing its 2019 ROD, the Navy increased flight operations at OLF Coupeville to more than 112,000 operations annually per its March 12, 2019, EIS; (2) whether the Navy's increase in Growler flight operations constituted a taking; and (3) whether the Navy must compensate plaintiffs. The first

---

[15] Even though the *Testwuide* court certified for interlocutory appeal the question of whether class certification was appropriate, the Federal Circuit denied plaintiffs' petition for permission to appeal the order, noting "the trial court's ruling that the question of law presented in the class certification motion is not a simple legal issue, but rather is intertwined with the merits of the case[.]" *Testwuide v. United States*, 73 F. App'x 395, 396 (Fed. Cir. 2003).

question can easily be resolved on a class-wide basis.[16] *See* [ECF 55] at 26. All that is required is for the Navy to confirm that flight operations at OLF Coupeville did in fact increase to more than 112,000 operations annually following the March 12, 2019 EIS. As to the remaining two questions, however, the answers will necessarily vary depending on multiple factors, such as where the plaintiffs live in relationship to the airstrip, the frequency of the flights in relation to their property, whether the planes flew directly over their property, the altitude at which the planes flew, the noise levels experienced by the plaintiffs, and the degree and ways in which the noise and vibrations caused by the flights interfered with the plaintiffs' enjoyment and use of their property. Because the evidence necessary to resolve these questions will vary to such a great degree between the plaintiffs, the issues of whether the Navy's increase in flight operations constitutes a taking and whether the Navy must provide compensation are not suitable for resolution on a classwide basis.[17] *See Brown*, 126 Fed. Cl. at 583 (denying class certification because, *inter alia*, the question of whether the Surface Transportation Board's issuance of a Notice of Interim Trail Use or Abandonment constituted a taking could not be resolved on a class-wide basis since the notice only constituted a taking if the railroad possessed an easement solely for railroad purposes—a calculus that was not the same for each property owner); *Cf. Persyn v. United States*, 34 Fed. Cl. 187, 196 (1995), *aff'd*, 106 F.3d 424 (Fed. Cir. 1996) ("Avigation easement claims [generally] cannot be tried on a 'one size fits all' formula. Each element must be established for each parcel, and evidence of a taking over one parcel in a case does not, without more, support a finding of a taking over other parcels.").

       Further, even if the commonality requirement could be satisfied by the shared experience of the proposed class members allegedly impacted by the Navy's increased flight operations, the predominance requirement would present a far more demanding hurdle for plaintiffs to overcome in their pursuit of class certification. Any "overarching dispute" about the impacts of the Navy's increased flight operations on properties within the vicinity of OLF Coupeville and their owners' respective entitlements to compensation cannot predominate given the number and significance of the individualized questions necessary to prove a taking within the meaning of the Fifth Amendment. *See Amchem Prods.,* 521 U.S. at 623-24. Thus, if plaintiffs cannot satisfy the commonality requirement by the way in which they frame the proposed class, they clearly cannot satisfy the more demanding predominance requirement.[18] *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (citing *Amchem Prods., Inc.,* 521 U.S. at 623-24).

---

[16] The government concedes that the first question is common to the class: "Plaintiffs have adequately alleged that the United States acted on grounds applicable to the class as a whole—namely, the increase in Growler flights described in the 2019 ROD." [ECF 58] at 23 n.7.

[17] Plaintiffs argue that the altitude and path of individual flights are irrelevant because their claim is that the overall increase in flights constitutes a "particularly burdensome pattern of military operations." [ECF 62] at 23-24. The Court disagrees. The altitude and path of individual flights, which are not factors common to the class, directly impact the burdensomeness of the flight operations.

[18] Plaintiffs contend that "the predominance requirement is satisfied where the common question is 'whether each putative class member has been affected by the same Government policy.'" [ECF 55] at 34 (quoting *DeMons v. United States*, 119 Fed. Cl. 345, 355 (2014)). This statement is misleading. In *DeMons*, the court held that a common question predominated because each putative class member's damages, which resulted from the government's alleged failure to comply with federal pay statutes, could be determined using computerized pay records. *See* 119 Fed. Cl. at 357. The critical issue, therefore, was not whether class members were affected by a

### C.      Typicality

To satisfy the typicality requirement, the class representatives' claims must be typical of the proposed class. *Common Ground Healthcare Coop.*, 137 Fed. Cl. at 637. "Plaintiffs prevail on this point if they can show that even if some factual differences exist between the claims of the named representatives and the claims of the class . . . the named representatives' claims share the same essential characteristics as the claims of the class at large." *Curry v. United States*, 81 Fed. Cl. 328, 335 (2008) (quotation marks omitted). A finding of typicality, however, does not mean that the claims of the named representatives and the claims of the class are identical. *Id.* Further, as with the commonality requirement, the typicality requirement "serve[s] as [a] guidepost[] for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected . . . ." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (quoted in *Curry*, 81 Fed. Cl. at 335).

Here, plaintiffs argue that they have satisfied the typicality requirement because all of their claims arose from "the Navy's taking of an avigation easement as a result of increased operations out of OLF Coupeville as a result of its 2019 Record of Decision," and because they all rely on the same legal theory—"that the Government's action constitutes a taking of their property in contravention of the Fifth Amendment." [ECF 55] at 28. The government counters that the representatives' claims are not typical because their properties are located in different areas of Whidbey Island and therefore the flights, which occur at different altitudes and follow different routes, impact them in different ways. [ECF 58] at 41.

The Court finds that, while the representatives' claims and the claims of the proposed class are premised on a common legal theory (as explained above in the Court's discussion of the commonality requirement), there are simply too many factual differences between them and the class for the Court to conclude that the typicality requirement has been met. For example, all five of the proposed class representatives own property that is subject to direct overflights. *See* Borton Decl. [ECF 55-5] ¶ 6 ("After the increased operations out of the OLF in March 2019, there was a drastic increase in flights directly over our property."); Firnstahl Decl. [ECF 55-6] ¶ 14 ("The jets flew either directly above my house or to the left or the right side of it."); Kingston Decl. [ECF 55-7] ¶ 10 ("The jets operating out of OLF Coupeville fly directly over Admiral's Cove, and go directly over our home."); Plecki Decl. [ECF 55-8] ¶ 8 ("This designation was very concerning when considered in tandem with the fact that the jets would frequently pass directly over my house and properties at low altitudes."); Wiley Decl. [ECF 55-9] ¶ 11 ("For example, I have been able to clearly discern the pilot's helmet and glasses in the cockpit as they fly overhead."). Thus, despite the fact that all plaintiffs complain of a burdensome pattern of military operations, the claims of the class representatives are not typical of those class members who assert a takings claim based solely on noise because the properties of the latter group are not located directly below the Growlers' flight path. While all plaintiffs are, by definition, allegedly subjected to 65 db DNL sound levels, the number of additional factors that would necessarily determine each plaintiff's entitlement to compensation in this case demonstrates the atypicality

---

single government policy, but whether common questions regarding the class, which was affected by a single government policy, predominated over individual ones.

of the class representatives' claims. Therefore, the Court finds that the class representatives do not share the same essential characteristics as the claims of the class at large.

### D. Adequacy

In order to satisfy the adequacy requirement, the prospective class representatives must be able to "fairly represent the proposed class." *Common Ground Healthcare Coop.*, 137 Fed. Cl. at 637. Here, plaintiffs argue that they have satisfied the adequacy of representation requirement because counsel "are sufficiently qualified, experienced, and able to represent the proposed class in this litigation," and because the five proposed class representatives are willing to serve in that capacity and have demonstrated their commitment to the litigation. [ECF 55] at 29-30. Plaintiffs further contend that the opt-in nature of class actions in the Court of Federal Claims mitigates any concerns over potential conflicts of interest between class representatives and potential class members because by opting in, class members "demonstrate at least minimal knowledge of and interest in the litigation." *Id.* (quotation marks omitted). At this time, the government does not challenge the ability of plaintiffs' counsel to adequately represent the class. [ECF 58] at 20 n.5. The Court therefore finds, based on the representations of plaintiffs' counsel, that plaintiffs have satisfied the adequacy requirement. *See* [ECF 55] at 29-31 (describing counsels' experience in class actions and complex civil litigation as well as the five proposed class representatives' commitment to the instant case and the alignment of their interests with those of the putative class members).

### E. Superiority

In order to satisfy the superiority requirement, a class action must be "the fairest and most efficient method of resolving the suit." *Common Ground Healthcare Coop.*, 137 Fed. Cl. at 637. "The superiority requirement is met where 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Fisher v. United States,* 69 Fed. Cl. 193, 205 (2006) (quoting *Barnes,* 68 Fed. Cl. at 499). "When reviewing motions to certify a class, this court has previously utilized a cost-benefit analysis, weighing foreseeable manageability or fairness problems against 'the benefits to the system and the individual members likely to be derived from maintaining such an action.'" *Curry,* 81 Fed. Cl. at 337 (quoting *Barnes*, 68 Fed. Cl. at 499). RCFC 23(b)(3) provides a list of non-exhaustive factors to be considered in determining whether the superiority requirement has been met, including: "the class members' interests in individually controlling the prosecution of separate actions;" "the extent and nature of any litigation concerning the controversy already begun by class members;" and "the likely difficulties in managing a class action."

Here, plaintiffs contend that because "there are thousands of potential individual claimants that share the common issue of having their private property taken by the same, single Government decision," certification "will allow for consolidation of these claims, thereby reducing the time and expense of litigation, ensuring a consistent decision regarding the Government's liability and enabling class members with smaller damages to assert their claims." [ECF 55] at 37 (quotation marks omitted). Plaintiffs add the following: "That is particularly true here where impacted properties have varying values and thus different potential damages returns

and where these damages can easily be assessed consistently and fairly through an automated model." *Id.* The government argues that plaintiffs' mass compensation approach is flawed and that "because Plaintiffs' methodology is unsound, what is left are determinations on a per-property basis." [ECF 58] at 43. The government further avers that the individualized issues that preclude a finding of commonality and predominance in this case also pose serious challenges to the efficiency and manageability of this case as a class and demonstrate that a class action is not the superior method of conducting this litigation *Id.* at 44-45.

The Court finds that managing the instant case as a class action based on plaintiffs' proposed class is not the fairest and most efficient method to proceed with this litigation, and thus plaintiffs have not satisfied the superiority requirement. The Court reaches this conclusion without needing to consider plaintiffs' expert's proposed methodology for assessing damages, which the government contends is severely flawed. That is because, as discussed above, *see supra* Section III.B, assessing liability as to plaintiffs' proposed class would require individualized determinations. Apart from any difficulties inherent in the calculations of damages, the need to make these individualized liability determinations severely hinders the manageability of this case as a class action. For this reason, a class action would fail to achieve economies of time, effort, and expense. *See Fisher*, 69 Fed. Cl. at 205 ("A class action must represent the best 'available method[] for the fair and efficient adjudication of the controversy.'" (quoting FRCP 23(b)(3)) (alteration in original)).

## IV.   CONCLUSION

Plaintiffs have failed to satisfy the commonality, typicality, and superiority requirements under RCFC 23. Accordingly, plaintiffs' motion for class certification [ECF 55] is **DENIED**. The parties **SHALL** meet-and-confer regarding how this case shall proceed and file a joint status report on or before July 21, 2023, informing the Court of the outcome of their deliberations and proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge