# In the United States Court of Federal Claims

No. 19-1407

(Filed: September 15, 2025)

```
*************************************
KANDI ARNHOLD, et al.,              *
                                    *
                  Plaintiffs,       *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
                  Defendant.        *
*************************************
```

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, DC, counsel for Plaintiffs. Also with whom were *Stephen E. Morrissey, Jordan Connors, Jenna G. Farleigh, and Tanner Laiche*, Susman Godfrey LLP, Seattle, WA.

*Gregory M. Cumming*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

The plaintiffs in this putative class action against the United States allege violations of the Takings Clause of the Fifth Amendment to the United States Constitution and breach of contract due to EA-18G Growler flight operations by the United States Navy at an air strip on Whidbey Island, Washington. Before the Court is the government's motion for partial summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons set forth below, the government's motion is **DENIED**.

## I.   BACKGROUND

The plaintiffs in this case are the owners of properties located near Outlying Field Coupeville ("OLF Coupeville"), an aircraft landing strip on Whidbey Island. Fourth Am. Compl. [ECF 127] ¶ 1. OLF Coupeville was built in 1943 for Navy pilot training and is part of Naval Air Station Whidbey Island ("NASWI"). *Id.* ¶ 11; United States' Mot. for Summ. J. [ECF 134] at 10.[1] "[T]he Navy began using OLF Coupeville for field carrier landing practice" in the late 1960s, in support of the Vietnam War effort. [ECF 134] at 11; *see* [ECF 127] ¶¶ 11, 12. Field carrier landing practice ("FCLP"), "also known as a 'touch and go' landing[,] simulates the act

---

[1] All references to page numbers within documents filed electronically with the Court refer to the page numbers generated by the CM/ECF system.

of landing on an aircraft carrier at sea." [ECF 134] at 11; *see* [ECF 127] ¶ 12. The practice "involve[s] groups of several aircraft flying in patterns, with each jet then approaching the runway, touching down, and then taking off again without coming to a stop." [ECF 127] ¶ 12; *see* [ECF 134] at 12-13. "An FCLP flight operation consists of a single takeoff or a single landing; therefore, one full loop involving a takeoff and landing constitutes two FCLP operations." [ECF 134] at 13; *see* March 12, 2019 Navy Record of Decision ("2019 ROD") [ECF 55-11] at 9 (stating that "each airfield 'operation' is defined as either a takeoff or landing").

Since the 1960s, the Navy has continuously used OLF Coupeville for FCLP, but the number of operations has varied. [ECF 134] at 14-15; Pls.' Opp. [ECF 141] at 10. For instance, during the Vietnam War, the Navy increased operations from 1,236 in 1967, to 27,130 in 1968, and to 39,246 in 1969. *Argent v. United States*, 124 F.3d 1277, 1279 (Fed. Cir. 1997). After the Vietnam War, operations at OLF Coupeville declined but did not cease. *Id.*; [ECF 134] at 15; [ECF 141] at 10-11. Another peak in FCLP operations occurred in the early 1990s during the Desert Storm/Desert Shield conflict, reaching 32,080 in 1990. *Argent*, 124 F.3d at 1279; *see* [ECF 134] at 15. The fluctuations in operations are shown in the below table:[2]

| Year | Number of Operations | Year | Number of Operations | Year | Number of Operations | Year | Number of Operations |
|---|---|---|---|---|---|---|---|
| 1967 | 1,236 | 1982 | 14,472 | 1997 | 9,736 | 2012 | 9,668 |
| 1968 | 27,130 | 1983 | 11,782 | 1998 | 6,808 | 2013 | 6,972 |
| 1969 | 39,246 | 1984 | 12,726 | 1999 | 6,752 | 2014 | 6,072 |
| 1970 | 37,218 | 1985 | 13,924 | 2000 | 6,378 | 2015 | 6,120 |
| 1971 | 18,392 | 1986 | 22,232 | 2001 | 3,568 | 2016 | 6,120 |
| 1972 | 13,572 | 1987 | 30,350 | 2002 | 4,100 | 2017 | 5,804 |
| 1973 | 16,764 | 1988 | 30,442 | 2003 | 7,684 | 2018 | 6,120 |
| 1974 | 21,180 | 1989 | 22,596 | 2004 | 4,314 | 2019 | 19,424 |
| 1975 | 24,844 | 1990 | 32,080 | 2005 | 3,529 | 2020 | 22,682 |
| 1976 | 17,810 | 1991 | 27,088 | 2006 | 3,413 | 2021 | 11,004 |
| 1977 | 17,748 | 1992 | 25,844 | 2007 | 3,976 | 2022 | 12,436 |
| 1978 | 24,378 | 1993 | 21,324 | 2008 | 2,548 | 2023 | 13,552 |

---

[2] The data for the years 1967 through 1991 is taken from the United States Court of Appeals for the Federal Circuit's *Argent* decision. *Argent*, 124 F.3d at 1279. The data for the years 1992 and 1993 is taken from an aircraft noise study conducted by the Navy in 1994. 1994 Aircraft Noise Study [ECF 136-9] at 12. The data for the years 1994 through 2002 is taken from an environmental assessment for the replacement of aircraft conducted by the Navy in 2004. 2005 Aircraft Replacement Study Findings [ECF 136-10] at 152. The data for the years 2003 through 2014 is taken from the government's motion for summary judgment. [ECF 134] at 20-21 (citing *Citizens for the Ebey's Reserve for a Healthy, Safe & Peaceful Env't v. U.S. Dep't of the Navy*, 122 F. Supp. 3d 1068, 1079 (W.D. Wash. 2015)). The data for the years 2015 through 2023 is taken from various flight activity reports compiled by the Navy. Consolidated Air Traffic Reports [ECF 137-4] at 4, 14, 19, 22-23, 25-26, 28, 30.

Although the plaintiffs question the accuracy of the Navy's annual operation totals from 1967 to 1991, [ECF 141] at 10 n.5 ("It is important to note that these historical flight numbers are uncertain; importantly, the Government's own expert on which it relies in its Motion does not know what was counted as an 'operation' in historical figures."), they accept them for purposes of responding to the government's motion, *id.* at 10-11.

| 1979 | 20,282 | 1994 | 21,628 | 2009 | 5,292 | | |
| 1980 | 12,190 | 1995 | 19,854 | 2010 | 6,476 | | |
| 1981 | 16,848 | 1996 | 13,066 | 2011 | 9,378 | | |

In 1992, in *Argent v. United States*, area property owners alleged that "noise from aircraft flying over and around their property permanently and substantially interfere[d] with their use and enjoyment of their property," resulting in a taking in violation of the Fifth Amendment to the United States Constitution. 124 F.3d at 1279. The *Argent* lawsuit stemmed from the Navy's increased FCLP operations at OLF Coupeville in the mid-to-late 1980s. *Id.* at 1279-80. In 1997, the Federal Circuit reversed the trial court decision granting summary judgment in favor of the government and determined that "outstanding factual disputes . . . preclude entry of summary judgment." *Id.* at 1287. Thereafter, the parties settled their dispute. [ECF 127] ¶ 13; Joint Stipulation in *Elliot v. United States*, No. 92-309 (Fed. Cl. Feb. 19, 2002) [ECF 127-1] at 2-9.[3] Under the settlement, the Navy purchased a limited avigation easement from certain property owners for a lump sum. *Id.* at 3. As to certain property owners, "the Navy agreed to include[] (1) a restriction on the aircraft flown (e.g., the Navy agreed to only fly the A-3D, the A-6E, the Prowler 'or follow-on aircraft of lesser of comparable noise level') and (2) to fly 'no more than 10,000' flights over the landowner's property per calendar year using OLF Coupeville." [ECF 127] ¶ 13 (quoting [ECF 127-1] at 7-8). As to other property owners, the Navy also agreed to "only fly military jets over 1,000 feet above ground level." *Id.*

The Navy began performing FCLP operations in the late 1960s using the Grumman A-6 "Intruder." 2004 Air Installations Compatible Use Zones ("AICUZ") Study Update - NASWI [ECF 135-2] at 2. From 1970 to 2015, the Navy performed these operations using the Grumman EA-6B "Prowler." 2021 AICUZ Study – NASWI [ECF 135-3] at 30. In early 2005, the Navy conducted an environmental assessment of its proposed replacement of the Prowler aircraft with the EA-18G "Growler" aircraft at NASWI. [ECF 136-10] at 6. In 2013, the Navy published a "Notice of Intent to Prepare an Environmental Impact Statement [('EIS')]" to analyze the impacts of basing additional Growler jets at NASWI. [ECF 134] at 20 (citing 78 Fed. Reg. 54,635 (Sept. 5, 2013)). The Navy published the final EIS in September 2018, examining various alternative plans. 2018 Growler EIS – NASWI [ECF 135-1] at 1-11. Under the EIS, the Navy proposed to "continue and expand existing Growler operations at the [NASWI] complex which includes . . . FCLP by Growler aircraft that occurs at . . . OLF[] Coupeville" and to "increase electronic attack capabilities by adding 35 or 36 aircraft." *Id.* at 2.

In the 2019 ROD, the Navy memorialized its intent to increase Growler operations on Whidbey Island. [ECF 55-11] at 2. The Navy stated that it would add thirty-six Growlers to NASWI. *Id.* The Navy further stated:

> [A]nnual airfield operations at the NAS[WI] complex would increase up to 33 percent . . . for an estimated total of 112,100 operations annually, including 88,000 operations at Ault Field and 24,100 operations at OLF Coupeville. Of the 24,100 operations at OLF Coupeville, 23,700 would be EA-18G Growler FCLPs. Since

---

[3] Mr. Elliott was one of the named plaintiffs in the *Argent* lawsuit.

> each airfield "operation" is defined as either a takeoff or landing . . . about 12,000 FCLP "passes" would occur annually at OLF Coupeville. This change amounts to an increase from approximately 90 hours (1 percent of total hours per year) to 360 hours (4 percent of total hours per year) in aircraft activity at OLF Coupeville. These operational levels are comparable to historic flight operations experienced from the 1970s through the 1990s at the NAS[WI] complex.

*Id.* at 9-10. In addition to the number of operations, the Navy also considered the noise associated with increased operations. *Id.* at 10-12. In this regard, the Navy stated:

> Although [the preferred alternative] would result in both an increase in the number of people exposed to noise, as well as an increase in levels of noise to those exposed, research conducted to date has not made a definitive connection between intermittent aircraft noise and nonauditory health effects. The results of most cited studies are inconclusive and cannot identify a causal link between aircraft noise exposure and the various types of nonauditory health effects that were studied. An individual's health is greatly influenced by many factors known to cause health issues, such as hereditary factors, medical history, and lifestyle choices regarding smoking, diet, and exercise. Research has demonstrated that these factors have a larger and more direct effect on a person's health than aircraft noise.

*Id.* at 12. After the Navy issued the 2019 ROD, FCLP operations at OLF Coupeville increased, as shown in the above table. *See* [ECF 134] at 22; [ECF 141] at 13.

      On September 12, 2019, the plaintiffs filed a complaint in this Court on behalf of themselves and a purported class of similarly situated persons. Class Action Compl. [ECF 1]. The plaintiffs filed a motion to certify a class under RCFC 23, Pls.' Mot. for Class Cert. [ECF 55], which the Court denied, *Arnhold v. United States*, 166 Fed. Cl. 499, 503 (2023). Thereafter, the parties agreed to eighteen bellwether plaintiffs for the purposes of fact and expert discovery.[4] [ECF 83] at 1. The Court entered a scheduling order on February 11, 2025, providing deadlines for the completion of expert discovery and the filing of dispositive motions, as well as trial dates. Scheduling Order [ECF 124]. On April 25, 2025, the government filed the instant motion for partial summary judgment as to the takings claims of the bellwether plaintiffs. [ECF 134].[5] The

---

[4] The bellwether plaintiffs are: (1) Janet Gardner; (2) Don and Sheryl Sato; (3) Steven and Harriet Borton; (4) Janet Buttenwieser and Matt Wiley; (5) Maryon Attwood and Robbie Lobell; (6) Sarah-Lyn Clark and James Nagel; (7) Heide Horeth and Jerome Squire; (8) Carlene Carl; (9) Terry C. Heaton; (10) John and Victoria Kingston; (11) Jenean Boggs; (12) Kurt and Jacqueline Blankenship; (13) Paul Firnstahl and Teresa Ligtenberg; (14) Monte and Janet Hull; (15) Mary and Philip Juetten; (16) Michael King and Marge Plecki; (17) Greg and Doreen Lucas; and (18) Andrea Scherencel. Joint Status Report [ECF 83] at 1-2.

[5] The government moves for summary judgment solely as to the plaintiffs' takings claims, not as to the breach of contract claims, which were only alleged by certain plaintiffs. [ECF 134] at 9 n.1.

motion is fully briefed. *See* [ECF 141]; United States' Reply [ECF 145]. On July 17, 2025, the Court held a hearing on the motion. *See* [ECF 152].

## II.     LEGAL STANDARDS

Under RCFC 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it might impact the outcome of the suit under the governing law. *Id.* at 248. Thus, a dispute over a material fact precludes summary judgment while a dispute over an irrelevant fact will not. *Id.* When ruling on a motion for summary judgment, the Court does not "weigh the evidence or determine the truth of the matter but merely determine[s] whether there is a genuine issue for trial." *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1339 (Fed. Cir. 2022) (internal quotation marks omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this initial burden is satisfied, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Id.* at 324. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* (internal quotation marks omitted). In response thereto, however, "the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor." *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1358 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). If the nonmovant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

## III.    DISCUSSION

The government argues that the plaintiffs' takings claims are barred by the Tucker Act's six-year statute of limitations, that certain plaintiffs fail to show the necessary elements to prove a taking of an avigation easement, and that the plaintiffs fail to demonstrate their entitlement to compensation. As explained below, the Court finds that the plaintiffs' takings claims are timely but that genuine issues of material fact relating to the alleged takings and the plaintiffs' entitlement to compensation preclude granting summary judgment in favor of the government.

### A.     The Timeliness of the Plaintiffs' Takings Claims

The United States Court of Federal Claims has limited jurisdiction. *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997) (citing 28 U.S.C. § 1491(a); *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993)). The Court's jurisdiction is established by the Tucker Act,

which states, in relevant part, that this Court "shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ." 28 U.S.C. § 1491(a)(1). The Tucker Act "does not create a substantive cause of action" but rather requires a plaintiff "to identify a substantive source of law that creates the right to recovery of money damages against the United States." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d. 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976); *United States v. Mitchell*, 462 U.S. 206, 216 (1983)). Further, a Tucker Act claim must be filed within six years of the date of its accrual. *See* 28 U.S.C. § 2501; *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986) (citing *Bray v. United States*, 785 F.2d 989, 992 (Fed. Cir. 1986) ("Compliance with the Claims Court's statute of limitations is jurisdictional.")). "In any case before the court, plaintiff must establish jurisdiction before the court can consider the merits of the complaint . . . [and must do so] by a preponderance of the evidence." *U.S. Sec. Assocs., Inc. v. United States*, 124 Fed. Cl. 433, 436 (2015) (citing *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010)).

"[T]he Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008). The Takings Clause provides, *inter alia*, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *United States v. Causby*, 328 U.S. 256, 266 (1946). "[T]hree factors [are considered] significant in determining whether noise and other effects from overflights interfered with the property owner's rights in such a way as to constitute a taking of an avigation easement and hence require compensation." *Brown v. United States*, 73 F.3d 1100, 1102 (Fed. Cir. 1996) (citing *Causby*, 328 U.S. at 266). They are whether "(i) the planes flew directly over the claimant's land; (ii) the flights were low and frequent, and (iii) the flights directly and immediately interfered with the claimant's enjoyment and use of the land." *Id.* Further, "the interference with enjoyment and use [must be] substantial." *Id.* (internal quotation marks omitted).

In assessing "the viability of a takings claim based on frequent flights at low altitudes directly over the plaintiff's property," *Testwuide v. United States*, 56 Fed. Cl. 755, 763-64 (2003), "[c]ases following *Causby* have [generally] concluded that flights above 500 feet in non-congested areas are in the public domain, *i.e.,* in navigable airspace," *id.* at 763 (citing *Stephens v. United States,* 11 Cl. Ct. 352, 358-59 (1986)). "In congested areas, the navigable airspace begins at 1,000 feet." *Id.* (citing *Stephens,* 11 Cl. Ct. at 359). However, a taking may still occur, even if not all three *Causby* factors are satisfied. *Testwuide*, 56 Fed. Cl. at 764. For example, a taking may occur if the plaintiffs are subjected to peculiarly burdensome government flights that occur within navigable airspace, *id.* (citing *Branning v. United States*, 654 F.2d 88, 90 (Ct. Cl. 1981), *aff'd*, 784 F.2d 361 (Fed. Cir. 1986)), or if the plaintiffs are subjected to "a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that significantly impairs their use and enjoyment of their land," *Testwuide*, 56 Fed. Cl. at 765 (quoting *Argent*, 124 F.3d at 1284) (internal quotation marks omitted).

A takings claim under the Tucker Act accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)). Generally, "[t]he taking of an avigation easement by the Government occurs when the Government begins to operate aircraft regularly and frequently over a parcel of land at low altitudes, with the intention of continuing such flights indefinitely." *Argent*, 124 F.3d at 1285 (quoting *Lacey v. United States*, 595 F.2d 614, 618 (Ct. Cl. 1979)). Further,

> [t]o the extent that a taking of an avigation easement could occur gradually, "[t]he overwhelming weight of authority holds that . . . the extent of the invasion and the degree of interference is ascertainable when the United States *begins* to operate its aircraft at low elevations and with such frequency that they substantially interfere with the use and enjoyment of the land, with the intent to continue such flights indefinitely."

*Andrews v. United States*, 108 Fed. Cl. 150, 157 (2012) (second and third alterations in original) (quoting *Persyn v. United States*, 34 Fed. Cl. 187, 197 (1995), *aff'd*, 106 F.3d 424 (Fed. Cir. 1996)).

The taking of a second avigation easement occurs when the government either "increas[es] the number of flights," *Argent*, 124 F.3d at 1285 (citing *Avery v. United States*, 330 F.2d 640, 643 (Ct. Cl. 1964)), "or introduc[es] noisier aircraft[s]," *Argent*, 124 F.3d at 1285 (citing *Lacey*, 595 F.2d at 619). "Since the measure of damages is 'the owner's loss, not the taker's gain,' a subsequent loss in property value may be an essential factor in [the] determination of a subsequent taking." *Avery*, 330 F.2d at 643 (internal citations omitted) (noting that "[i]ncreased operations . . . or the introduction of new aircraft . . . either or both of which results in greater noise, greater inconvenience and a further reduction of land values" are two factors that should be examined to determine whether a second taking has occurred); *Morgan v. United States*, 101 Fed. Cl. 145, 165 (2011) (stating that in addition to demonstrating either a new flight path, an increase in overflights, or a new aircraft, "a plaintiff must prove that there has been an increased interference with the use and enjoyment of the property and that the new activities have resulted in an additional diminution in the value of the property").

Here, the government contends that the plaintiffs' takings claims are time-barred. [ECF 134] at 32-33. The government states that "NASWI has been used for flight operations for decades," and that, while "[t]he number of annual flights has fluctuated over time," the "[u]ndisputed facts show that operational levels were significantly higher in the early 1990s (as well as during early time periods)." *Id.* at 35. According to the government, "whether assessed through the number of operations or the levels of noise caused by those operations, Plaintiffs' properties have been subjected to consistent Naval jet operations such that their claims accrued well before November 2013 (six years before they filed suit)." *Id.* at 35-36. Regarding Ms. Attwood and Ms. Lobell, the government argues that because they "testified that they

7

experienced 'debilitating' and 'unbearable' impacts to their use and enjoyment years before the alleged date of tak[ing] in March 2019," *id.* at 41, their takings claim is time barred, *id.* at 43.

The plaintiffs respond that "[e]ven where an earlier taking has occurred, a later phase of government activity—such as the introduction of new approach procedures and increased operations—can give rise to a new taking claim." [ECF 141] at 21-22 (internal quotation marks omitted). In other words, the plaintiffs contend that "[a] taking . . . may unfold in multiple parts, and a claim based on a later phase may not accrue until long after the initial one." *Id.* at 22. Accordingly, the plaintiffs argue that their takings claims accrued "on March 12, 2019, when the Navy issued its [2019 ROD] and began implementing its plan to ramp up operations," and that their complaint, filed on September 12, 2019,[6] is timely. *Id.* As to Ms. Attwood and Ms. Lobell's claim, the plaintiffs argue that Ms. Attwood, like the other bellwether plaintiffs, "pointed to 2019, and the [2019 ROD], as a turning point when the jet noise became unbearable." *Id.* at 32.

The Court finds that the plaintiffs' takings claims are timely. In the 2019 ROD, the Navy stated that it intended to increase the number of Growlers based at NASWI and that it intended to increase the number of FCLPs out of OLF Coupeville. [ECF 55-11] at 9-10. Shortly thereafter, the Navy increased the number of FCLPs at OLF Coupeville. *See* [ECF 134] at 22 (showing increased flights starting in 2019); *see also* [ECF 141] at 7. The plaintiffs allege that the Navy's change in flight activity increased the levels of noise, vibrations, and fumes over their properties and rendered them uninhabitable. [ECF 127] ¶¶ 31, 36; *see* [ECF 141] at 6-7 (emphasizing the increase in flight activities at OLF Coupeville in 2019 and 2020 and stating that the "[p]laintiffs' taking claims are expressly limited to the operational changes resulting directly from the Navy's March 12, 2019 decision to pursue the flight increase at OLF Coupeville") (emphasis omitted). Thus, because of the 2019 ROD, and the Navy's subsequent increase in FCLP operations at OLF Coupeville, the plaintiffs became aware of the Navy's use of a new aircraft and change in flight activity at OLF Coupeville, as well as the Navy's intent to continue such activities indefinitely. These events triggered the statute of limitations for their claim that the government's actions constituted the taking of a second avigation easement. *See Casitas Mun. Water Dist.*, 708 F.3d at 1359 (quoting *Hopland Band of Pomo Indians*, 855 F.2d at 1577) (a claim accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence"); *Argent*, 124 F.3d at 1285 (stating that the taking of a second avigation easement occurs when the government either "increas[es] the number of flights, or introduce[es] noisier aircraft") (internal citations omitted). Because the plaintiffs filed their original complaint on September 12, 2019, their takings claims fall within the Tucker Act's six-year statute of limitations.[7]

---

[6] The plaintiffs amended their complaint on four occasions. *See* First Am. Compl. [ECF 49] (filed 9/8/2021); Second Am. Compl. [ECF 74] (filed 10/13/2023); Third Am. Compl. [ECF 77] (filed 10/30/2023); and Fourth Am. Compl. [ECF 127] (filed 2/26/2025).

[7] While the Court finds that a claim for the alleged taking of a second avigation easement is timely, there are genuine issues of material fact regarding the scope of the government's existing easement. Depending on the scope of the government's existing easement, *i.e.*, type of plane, number of operations, flight path, vibration and noise level, the government actions that form the basis of the instant takings claims may or may not be covered by such easement and, consequently, may or may not result in the taking of a second avigation easement.

8

### B. The Plaintiffs' Proof of a Second Avigation Easement Takings Claim

"Avigation easement claims cannot be tried on a 'one size fits all' formula." *Persyn*, 34 Fed. Cl. at 196. Rather, "[e]ach element must be established for each parcel, and evidence of a taking over one parcel in a case does not, without more, support a finding of a taking over other parcels." *Id.* As noted above, the Court must consider whether the subject flights are flying directly or indirectly over the plaintiff's property, whether the flights are low and frequent, and whether the flights directly, immediately, and substantially interfere with the plaintiff's enjoyment and use of the land. *Brown*, 73 F.3d at 1102 (discussing *Causby* factors and the third factor's requirement of "substantial" interference).

The government avers that certain plaintiffs cannot establish the government's liability for their takings claim. [ECF 134] at 45-47. According to the government, the properties owned by the Bortons, Ms. Boggs, Ms. Gardner, Ms. Attwood and Ms. Lobell, the Satos, and Ms. Horeth and Mr. Squire are not subject to overflights because they fall outside the flight track. *Id.* at 45-46. Additionally, the government contends that certain plaintiffs cannot establish causation. *Id.* at 49. The government maintains that the properties owned by Ms. Carl, the Satos, the Bortons, and Ms. Gardner are either subject to decreased noise levels (Ms. Carl and the Satos), or "barely noticeable" increases in the noise levels (the Bortons and Ms. Gardner). *Id.* at 50. The plaintiffs counter that "[a] taking can occur even absent a direct overflight." [ECF 141] at 35. Additionally, they note that "every Plaintiff with properties in this group that was asked testified that they had experienced direct Growler overflights while at home." *Id.* at 36. Further, in response to the government's contention that certain plaintiffs were subject to decreased or barely noticeable increases in noise levels after the 2019 ROD, the plaintiffs state that their noise expert reached a different conclusion and that the "plaintiffs themselves testified that the noise intrusions worsened—flights became more frequent, louder, and more disruptive—after March 2019 and deprived them of the use and enjoyment of their properties." *Id.* at 37. The Court finds that there are genuine issues of material fact regarding whether and to what extent the properties owned by the above-identified plaintiffs were subject to overflights and increased noise levels.

Regarding overflights, the law—as it currently stands—is flexible enough to recognize the taking of an avigation easement absent a direct overflight if the pertinent government activity is sufficiently burdensome. *See Argent*, 124 F.3d at 1283 ("The United States may take private property not only by physical occupancy, but also by imposing such burdens upon the use of property as to deprive the owner of the enjoyment of the land."); *Testwuide*, 56 Fed. Cl. at 765-66 (explaining that "in *Argent*, the court found that plaintiffs were not precluded from asserting a taking of an avigation easement when another factor of *Causby*, that the flights pass over the plaintiffs' property, was not satisfied . . . [provided that the government] activities were sufficiently burdensome to justify recovery").[8] Nevertheless, it remains unclear in this case

---

[8] The plaintiffs in *Argent* were owners of real property surrounding OLF Coupeville, who claimed "that the noise from aircraft flying over and around their property permanently and substantially interferes with their use and enjoyment of their property." 124 F.3d at 1279. In reversing the trial court's grant of summary judgment in favor of the government, the Federal Circuit explained that "[a]lthough federal courts have, by and large, required the facts of a case to match the *Causby* paradigm before allowing recovery, nothing in *Causby* or the intervening precedent

9

whether and to what extent the above-identified plaintiffs' properties are subject to overflights. Several of the plaintiffs testified to experiencing direct overflights. *See* November 12, 2020, H. Borton Dep. [ECF 141-22] at 12-17 (Ms. Borton testifying that prior to March 2019, the flights over and near her property were infrequent but that after March 2019, they sometimes occurred five days per week although this did not occur regularly); March 29, 2024, J. Boggs Dep. [ECF 141-15] at 14-15 (Ms. Boggs testifying that the flights over her property have increased dramatically, and that they occur daily and late at night); April 15, 2024, J. Gardner Dep. [ECF 141-14] at 15-18 (Ms. Gardner testifying that the flights over her property are disruptive and occur frequently but not necessarily on a daily or weekly basis); March 26, 2024, M. Attwood Dep. [ECF 141-17] at 8 (Ms. Attwood testifying that she experienced a doubling of overflights following the 2019 ROD); March 27, 2024, J. Squire Dep. [ECF 141-8] at 8 (Mr. Squire testifying that the jets fly over his property); *see also* [ECF 135-3] at 57 ("Flight tracks are bands, often a few hundred feet to several miles wide."). In contrast to the government's flight path model that depicts certain properties outside of the flight path, this testimony creates a genuine issue of material fact as to whether these plaintiffs' properties are subject to direct overflights.

Furthermore, the plaintiffs characterize the government's flight path model as "a predictive computer model that do[es] not reflect real-world operations . . . [and therefore] untrue as a matter of . . . fact." [ECF 141] at 41. Specifically, the plaintiffs point to evidence demonstrating that "flight tracks are represented as single lines on maps, [that] depict the predominant path aircraft fly over the ground . . . [and that d]epending on the type of flight track, aircraft can be several miles left or right of the flight track depicted on maps." [ECF 141] at 26 (quoting [ECF 141-30] at 6 (internal quotation marks omitted)). Additionally, the plaintiffs rely on testimony by the government's RCFC 30(b)(6) witness to challenge the veracity of the flight path model. [ECF 141] at 26-27. In that testimony, the government witness states that the prescribed flight tracks are "just one small spaghetti diagram, [and that] the swath of air that a jet has to fly based on winds, weather, [and] the weight of the aircraft all impacts how the flight pattern is flown." [ECF 141-2] at 11-12. The witness further explains that, during operations, the flight track can deviate "somewhere between 1 and 1.5, 1.7 miles' difference based on aircraft weight, winds, [and] weather." *Id.* at 14. Drawing all inferences in the plaintiffs' favor, the Court finds that there are genuine issues of material fact to be resolved at trial as to whether and to what extent the plaintiffs' properties are subject to overflights. *See Beres v. United States*, 104 Fed. Cl. 408, 418 (2012) ("If the nonmoving party produces sufficient evidence to raise a question as to the outcome . . . , then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to

---

limits a takings claim to only those facts" and that "overflight takings disputes defy *per se* rules or classification." *Id.* at 1282. The Federal Circuit acknowledged that certain plaintiffs "allege that planes fly overhead 'on occasion,' but much more frequently they 'corner' over adjacent properties, causing great disturbance on the [the plaintiffs'] property." *Id.* at 1283. Despite this fact, the Federal Circuit ruled that "[t]he Government cannot defeat [the plaintiffs' takings claim] merely by pointing out that most of its flights do not pass over the [plaintiffs'] land." *Id.* at 1284. Instead, the Federal Circuit explained that plaintiffs "complain of the entire course of operation at OLF Coupeville that entails hundreds of flights per week—an allegedly constant source of noise and disruption" and that "[i]f true, this activity is a peculiar burden imposed on the [plaintiffs] and their neighbors by the United States' selection of a remote site for aircraft training operations." *Id.* Therefore, the Federal Circuit allowed the plaintiffs' takings claim to avoid summary judgment and proceed to factfinding. *Id.* 1284-85.

whom the benefit of all presumptions and inferences runs.").

The Court also finds that there are genuine issues of material fact regarding whether and to what degree the properties owned by the above-identified plaintiffs are subject to increased noise. In response to the government's assertion that the plaintiffs have not experienced increased noise levels, the plaintiffs proffer testimony alleging that the noise intrusions worsened after the March 2019 ROD. *See* December 3, 2020, C. Carl Dep. [ECF 141-19] at 9-12, 18-20 (Ms. Carl testifying that the jet noise from the increased operations has interfered with her ability to lease her rental properties and has interfered with her own enjoyment of the properties); [ECF 141-22] at 17 (Ms. Borton testifying that after March 2019, the planes were flying over her house at a lower altitude and were therefore louder than they were before); [ECF 141-14] at 11-14 (Ms. Gardner testifying that the noise levels from the increased jets flying overhead beginning in March 2019 was painful and prevented her from gardening and entertaining guests at her home). The plaintiffs also provide a report by its noise expert to contradict the government's noise modeling. Pls.' Expert Witness Acoustical Report [ECF 141-27]. The report "addresses the impact of noise resulting from the 12 March 2019 increase in Growler jet traffic at OLF Coupeville on the surrounding community." [ECF 141-27] at 5. In summary, the plaintiffs' expert concluded that "the increased flight operations have significantly impacted the residents in the vicinity of OLF Coupeville by creating a high level of annoyance, impacting speech communication, disrupting sleep, interfering with indoor activities, and causing fear." *Id.* The expert also critiques the government's final EIS and concludes that the government "understates the noise impact of flight operations on the residents" in the vicinity of OLF Coupeville. *Id.* Like the extent of overflights affecting the plaintiffs' properties, the Court finds that there are also genuine issues to be resolved at trial as to whether and to what extent the plaintiffs' properties are subject to increased noise.[9] *See Beres*, 104 Fed. Cl. at 418.

        **C.**        **The Plaintiffs' Entitlement to Compensation**

"Under the Fifth Amendment to the Constitution, the plaintiffs are entitled to 'just compensation' for the property interest that was taken by the defendant . . . ." *Speir v. United States*, 485 F.2d 643, 648 (Ct. Cl. 1973). The amount of "[c]ompensation for the taking of an easement of flight is to be determined as of the time and place of the taking." *Id.* (citing *Mid-States Fats & Oils Corp. v. United States*, 159 Ct. Cl. 301, 309 (1962)). "Just compensation is the value of the interest taken; and the term 'value' is ordinarily used in the sense of 'market value' or 'fair market value,' *i.e.*, 'market value fairly determined.'" *Speir*, 485 F.2d at 648 (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943); *United States v. General Motors Corp.*, 323 U.S. 373, 379 (1945)). "[M]arket value is what a willing buyer would pay in cash to a willing seller." *Miller*, 317 U.S. at 374; *accord Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) (quoting *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632

---

[9] The record does not contain testimony by the Satos that they were subject to overflights or increased noise levels. However, the Court nevertheless denies the government's motion for summary judgment with respect to the Satos' claim because the law does not require a direct overflight for there to be a taking and the plaintiffs have demonstrated that, based on the evidence, there remain genuine issues of material fact regarding the flight paths, the levels of noise in the vicinity of OLF Coupeville, and the impacts to the Satos' property.

11

(1961) ("Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'")). However, "courts must have flexibility to determine in each individual case how to most accurately measure the economic value of what a takings claimant actually lost due to the governmental action." *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1353 (Fed. Cir. 2020) (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 295 (1981)).

Here, the government avers that the plaintiffs cannot demonstrate entitlement to compensation because they fail to provide market-based evidence of the diminution in value of their properties. [ECF 134] at 51. According to the government, the plaintiffs' evidence is inadequate because Mark Dunec, their appraiser, "only assessed . . . a hypothetical condition that is not based in reality; and . . . assign[ed] . . . percentage reductions in value based only on the increase in overflights that were not grounded against actual market data." *Id.* at 51-52. The plaintiffs counter that "Mr. Dunec undeniably applied recognized and accepted real estate valuation methodology and appraisal processes," [ECF 141] at 37, which are "prescribed by the Uniform Standards of Professional Appraisal Practice ('USPAP') and the Uniform Appraisal Standards for Federal Land Acquisitions," *id.* at 38. The plaintiffs also note that the government never filed a *Daubert* motion to exclude Mr. Dunec's opinions and that, therefore, the government's attempt to exclude their expert in the instant motion is premature. *Id.* at 8 n.4, 37. In its reply, the government does not argue that the plaintiffs' reliance on the USPAP standards is inappropriate, but instead contends that the plaintiffs' expert failed to comport with the guidance given therein. [ECF 145] at 31-32.

The Court finds that there are genuine issues of material fact regarding the fair market value of the plaintiffs' properties before and after the 2019 ROD. As noted above, while the government argues that the plaintiffs' expert does not provide evidence of the fair market value of the subject properties after the alleged taking, the plaintiffs contend that Mr. Dunec did conduct a market-based analysis and that his methodologies are accepted by nationally recognized industry groups. *See* [ECF 141] at 38-41 (explaining Mr. Dunec's approaches for analyzing the before-taking values and after-taking values of the relevant properties). Given the parties' disagreement as to the fair market value of the plaintiffs' properties, the issue cannot be resolved on summary judgment. Rather, the Court will determine Mr. Dunec's credibility as an expert witness and the legitimacy of his methodologies at trial. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Anaheim Gardens, L.P.*, 953 F.3d at 1356-57 (citing *Jay v. Sec'y of Dep't of Health & Hum. Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993) (stating that "the persuasiveness of an expert's explanation is not an issue to be weighed by the court on summary judgment.")); *Nicholson v. United States*, 170 Fed. Cl. 399, 416 (2024) ("Even if valuation discovery were concluded on both sides, it is highly improbable that this Court would determine the quantum of just compensation based solely on written submissions [in the parties' cross-motions for summary judgment]."). And, of course, the government may still, under the scheduling order currently in place, have an opportunity to seek the exclusion of Mr. Dunec's testimony by filing a *Daubert* motion. *See* [ECF 124] at 2 (stating that the parties have until December 5, 2025, to file their pre-

trial motions, including their motions *in limine*).

## IV. CONCLUSION

Accordingly, the government's motion for partial summary judgment, [ECF 134], is **DENIED**.

**IT IS SO ORDERED.**

                                                 s/ Thompson M. Dietz
                                                 THOMPSON M. DIETZ, Judge